PAUL A. BONIN, Judge.
 

 LThe Sisters of Mercy relocated their hospital from the Irish Channel to Mid-City in the middle of the last century. From then the hospital was in continuous and uninterrupted operation even through its sale to the national healthcare chain, Tenet Healthcare. Nearby, as is typical, there were numerous medical offices in which physicians affiliated with the hospital maintained their practices. Adjacent to the hospital was a medical office building, owned by Tenet, in which Dr. Beverly Yount practiced. The continuous providing of all these medical services was, of course, interrupted by the devastation caused by Hurricane Katrina in 2005.
 

 To date, Tenet has neither reopened the hospital nor the adjacent medical office building where Dr. Yount leased space. Unlike the national healthcare chain, Dr. Yount did reopen her medical practice pri- or to the end of the year at Touro Infirmary in Uptown New Orleans.
 

 Lafayette Insurance Company (hereinafter, “Lafayette”) seeks our review of the trial court judgment awarding an amount for the temporary interruption
 
 [1]
 
 to the | gmedical practice of its insured, Beverly Yount, M.D., APMC,
 
 [2]
 
 the plaintiff. For her part Dr. Yount appeals the trial court’s judgment limiting the time period for which damages were awardable and denying penalties and attorney’s fees. Based on our review, we affirm in part, reverse and vacate in part and render.
 

 FACTS AND PROCEDURAL HISTORY
 

 Effects of Hurricane Katrina
 

 On August 29, 2005, Hurricane Katrina made landfall causing catastrophic devas
 
 *165
 
 tation to the City of New Orleans. Dr. Yount leased an office suite from Tenet Mid-City Medical, L.L.C. (hereinafter, “Tenet”) in a professional medical building located at 3535 Bienville Street in New Orleans. The leased premises were located on the second floor of a multi-story building
 
 [3]
 
 , and comprised of approximately 2,083 square feet.
 

 As a result of the storm, the building sustained extensive wind damage and, due to the breaches in the City’s levee protection system, the first floor was inundated with seven to eight feet of water for approximately two weeks.
 

 About four weeks after Katrina made landfall, Dr. Yount was able to inspect the damage to her office suite. Due to the extreme heat and virtual darkness from the loss of electricity, this first visit was very brief. Later, Tenet set up temporary lighting so that the damage could be assessed and its lessees could remove their personal property. Accompanied by her office manager, Bonnie Williams, Dr. Yount would in serial short-term visits enter the premises to salvage her patients’ medical records. Because of environmental concerns, both women were required |3by Tenet to wear protective haz-mat suits and masks while in the building. In their forays into the suite, the women assessed the damage to Dr. Yount’s property and to the suite. In addition to the loss of refrigerated pharmaceutical items, Dr. Yount and Ms. Williams observed broken windows, missing ceiling tiles and water intrusion damage, as well as the growth of mold on the walls, ceiling, furniture and medical equipment. They were able to recover in large part the medical records and some artwork. However, Dr. Yount concluded that her equipment and furniture were either extensively damaged or hazardous for continued use in a medical practice. As such, the items were disposed of.
 

 Tenet first advised its lessees that the building would reopen in three to six months. However, it ultimately decided to permanently close it due to the extensive damage and excessive cost to renovate the property located in an area of the City that was not earmarked by governmental officials for priority rebuilding. When Dr. Yount learned that the medical building would not reopen as expected, on November 14, 2005, she immediately joined a medical practice affiliated with Touro Infirmary located in New Orleans.
 

 Claims Process
 

 Shortly after her first return to her office in September 2005, Yount filed a claim with her commercial insurer, Lafayette, for the property damage and economic losses sustained from the interruption of her medical practice. On October 23, 2005, Jeff Yearwood, an outside adjuster retained by Lafayette, inspected the premises. At the time, Dr. Yount provided financial records indicative of her income and expected losses, as well as evidence supporting her claim relative to the loss of refrigerated pharmaceutical items.
 

 | .Approximately five weeks later, Mr. Yearwood directed a report dated December 4, 2005 to Lafayette indicating his inspection showed “visible wind storm damage to the office suite,” but based on his review of the policy no coverage existed for such. About two weeks after receiving the Yearwood report, Lafayette sent its check in the amount of $678.00 to Dr. Yount in payment for her pharmaceutical losses. The insurer notified Dr. Yount by letters dated December 29, 2005 and January 9, 2006 that it was denying her claim for loss of income due to the interruption of her practice. In doing so,
 
 *166
 
 Lafayette cited to the commercial insurance policy at issue, which provides in part:
 

 A. Coverage
 

 We will pay for direct loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.
 

 [[Image here]]
 

 4. Additional Coverages
 

 e. Business Income
 

 We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your “operations” during the “period of restoration.” The suspension must be caused by
 
 direct physical loss of or damage to property
 
 at the described premises, including personal property in the open (or in a vehicle) within 100 feet, caused by or resulting from any Covered Causes of Loss.
 

 (Emphasis added.)
 

 In denying the claim, Lafayette cited the lack of “direct physical loss” from a “covered peril.” It maintained any financial losses suffered by Dr. Yount were flood-related stemming from a lack of access to the suite to conduct operations due solely to the deluge of water on the first floor. It reasoned, since flood waters were expressly excluded as a “covered peril” under the policy, the business interruption coverage was not implicated.
 

 \ ¿Legal Proceedings Petition
 

 On April 24, 2006, Dr. Yount instituted suit against Lafayette in which she alleged breach of contract for the recovery of insurance proceeds due to her under the business interruption provision of her commercial policy. She also demanded penalties and attorney’s fees for Lafayette’s alleged arbitrary and capricious handling of her insurance claim.
 
 [4]
 

 Motion in Limine
 

 Prior to trial, Lafayette filed a motion
 
 in
 
 limine seeking to bar Dr. Yount from offering inconsistent testimony regarding her business economic losses. Specifically, Lafayette alleged that Dr. Yount’s counsel represented in a previous discovery proceeding before the court that Dr. Yount’s financial losses encompassed only a two and one-half (2½) month period, and not the one-year period the plaintiff was the seeking to assert at trial. Granting Lafayette’s motion, the trial court found that the attorney’s statement was a judicial confession as to the time period for the calculation of damages at issue in the proceedings.
 
 [5]
 

 |
 
 ⅛Directed Verdicts
 

 In November 2007, a jury trial was conducted over the course of several days. At the close of the evidence, the trial judge
 
 *167
 
 granted a directed verdict in favor of the plaintiff finding that Dr. Yount produced sufficient evidence that the suite suffered direct physical damage caused by wind, which resulted in mold, and that there was coverage under the policy for such. Specifically, the court noted the record was absent evidence that the mold was exclusively caused by the floodwaters on the first floor. In support, the court relied on the testimony of Dr. Yount and Ms. Williams as to the presence of water stains and missing ceiling tiles. Moreover, the court placed emphasis on the testimony of Tenet’s representative, who testified as to the extensive wind damage to the roof, windows and exterior skin of the building. The court further relied on the testimony of Lafayette’s expert on insurance adjusting, Joe Rizzo, that there was wind damage to the suite and that “[y]ou can’t run a business with mold all over the place like that.”
 

 Additionally, the trial judge rendered another directed verdict on the issue of bad faith, but this one in favor of Lafayette. The trial judge found the absence of any misconduct on the part of the insurer in its handling of the claim. In support, the court recognized the timely adjusting of the claim and Dr. Yount’s failure to timely apprise the insurance carrier of her basis for the damage not being flood-related.
 

 _J•¡Jury Verdict and Judgment
 

 Following the court’s action on the motions for directed verdict, the jury only needed to determine quantum. The jury awarded to Dr. Yount business income losses in the amount of $68,472.00. An additional $1,600.00 was added to the judgment by stipulation, which represented interest paid on money borrowed by Dr. Yount to sustain her practice. Based on such, the trial court rendered a total judgment in the amount of $70,072.00. The instant appeal followed.
 

 LAW AND DISCUSSION
 

 Directed Verdicts and Merits of Claims
 

 Both parties assign as error the trial court’s granting of a directed verdict in favor of the other. Lafayette, in its first assignment of error, alleges the trial court erred as a matter of law in granting a directed verdict in favor of the plaintiff and thereby finding the existence of business interruption coverage. Dr. Yount challenges the directed verdict rendered in favor of Lafayette that determined the insurer was not arbitrary and capricious in the handling of the insurance claim. The standard for our review for both directed verdicts is the same.
 

 Louisiana Code of Civil Procedure article 1810, which governs directed verdicts, provides as follows:
 

 A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefore. |sThe order of the court granting a motion for a directed verdict is effective without any assent of the jury.
 

 A trial judge has much discretion in determining whether or not to grant a motion for directed verdict.
 
 Lott v. Lebon,
 
 96-1328, p. 4 (La.App. 4 Cir. 1/16/97), 687 So.2d 612, 615. The question to be asked by the court is not whether mover proved its case by a preponderance of the evi
 
 *168
 
 dence, but rather, upon reviewing the evidence submitted, the court could conclude that reasonable persons could not have reached a verdict in favor of the mover’s opponent.
 
 Descant v. Administrators of Tulane Educ. Fund,
 
 95-2127, p. 14 (La. App. 4 Cir. 1/21/98), 706 So.2d 618, 627. It is generally appropriate for a trial court to grant a motion for directed verdict in a jury trial when, after considering all evi-dentiary inferences in the light most favorable to the movant’s opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. If there is substantial evidence presented in opposition to the motion,
 
 ie.,
 
 evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury.
 
 Id-
 

 On
 
 appeal, the standard of review for legal sufficiency of the evidence challenges (a question of law), such as those presented by motions for directed verdicts, is
 
 de novo. Hall v. Folger Coffee Co.,
 
 2003-1734, p. 10 (La.4/14/04), 874 So.2d 90, 99.
 

 Coverage/Causation
 

 The propriety of a directed verdict must be evaluated in light of the substantive law related to the claims which are the subject of the litigation.
 
 Id.
 
 To properly address whether the trial court erred in granting a directed verdict in favor |aof the plaintiff on the issues of the existence of coverage and causation, we must first look to the substantive law dictating the interpretation of contracts to determine whether an ambiguity exists in the policy. The plaintiff argues there was direct physical loss and direct physical damage to the insured property caused by wind damage. In the event no physical loss or physical damage is found to exist, the plaintiff argues in the alternative that the policy is vague and ambiguous insofar the language may be interpreted to mean the plaintiff need only suffer
 
 damage
 
 to the insured property, not necessarily direct or physical. Relying on contract law, the plaintiff contends the contract must be interpreted in favor of coverage in light of the ambiguity.
 

 We are reminded that, when interpreting an insurance contract, courts must attempt to discern the common intent of the insured and insurer with an analysis that begins with a review of the words of the insurance contract. La. C.C. art. 2045;
 
 Succession of Fannaly v. Lafayette Ins. Co.,
 
 2001-1114, p. 3 (La.1/15/02), 805 So.2d 1134, 1137. If an ambiguity remains after applying the general rules of contractual interpretation to an insurance contract, the ambiguous contractual provision is construed against the insurer who furnished the contract’s text and in favor of the insured.
 
 Id.,
 
 p. 4, 805 So.2d at 1138; La. C.C. art. 2056. Absent a conflict -with statutory provisions or public policy, insurers, like other individuals, are entitled to limit their liability, and entitled to impose and to enforce reasonable conditions upon the policy obligations they contractually assume.
 
 Benton Casing Service, Inc. v. Avemco Ins. Co.,
 
 379 So.2d 225, 227 (La. 1979).
 

 As stated, the business income portion of the Lafayette policy is at issue in these proceedings. The section reads, in pertinent part: “We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your |^operations’ during the ‘period of restoration.’ The suspension must be caused by
 
 direct physical loss of or damage to property
 
 at the described premises, including personal property in the open ...
 
 caused by or resulting from any Covered Causes of Loss.
 
 [Emphasis added.]” Applying the legal tenets of contract interpretation, we,
 
 *169
 
 just as the trial court, determine the policy provision at issue to be clear and unambiguous as applied under the facts of this case.
 

 Although we have established the language of the contract is unambiguous, we must nonetheless address the issue of whether the trial court was manifestly erroneous or clearly wrong in granting a directed verdict in favor of the plaintiff on the issues of the existence of coverage and causation. The parties are in dispute as to whether there was direct physical loss or damage to the insured property. Even in the event such loss or damages are found to exist, they disagree as to the causation for such and whether it is a covered loss under the policy.
 

 Applying the principles relative to directed verdicts, we find the trial court erred in granting the directed verdict against Lafayette. In doing so, we are mindful that the standard is not whether in our view the plaintiff has proven its case by a preponderance of evidence, but rather the less burdensome standard of whether reasonable persons could not have reached a verdict in favor of the plaintiff against the insurance carrier.
 
 Hastings v. Baton Rouge Gen. Hosp.,
 
 498 So.2d 713, 718 (La. 1986). A review of the record indicates that a non-biased and reasonable minded jury might have reached a verdict in favor of Lafayette based on the evidence. Lafayette submitted into evidence its claims file, the adjuster’s inspection report, and the black and white photographs taken at the time of inspection. The parties raised viable arguments and inferences, albeit differing in their conclusions, drawn from their review of this documentary evidence as to the cause and extent of |n physical damage and loss to Dr. Yount’s property. Given the conflicting nature of the evidence, the factual issues as to the existence and the extent of damage should have been submitted to the jury.
 
 Reilly v. Dynamic Exploration, Inc.,
 
 571 So.2d 140, 144 (La.1990) (“Questions of credibility should not be resolved by a directed verdict.”).
 

 In light of the trial court’s error in the granting of the directed verdict, any findings on the part of the jury regarding causation and coverage were pretermitted. This exclusion of the fact finding process is a legal error now requiring this court to review the case
 
 de novo
 
 from the record and render a judgment based on whether the plaintiff sustained its burden by a preponderance of the evidence.
 
 Rosell v. ESCO,
 
 549 So.2d 840, 844 (La.1989).
 

 Following our examination of the causation and coverage issues
 
 de novo
 
 with reference to the arguments raised by both parties, we find that the evidence preponderates that there was direct physical damage and losses to the suite and to Dr. Yount’s property sufficient to interrupt Dr. Yount’s business operations, which damages and losses are neither related to or caused by the flooding of the first floor of the building. We are persuaded by the testimony of those persons who saw first hand the damage to the suite and its contents, as well as the building itself. Returning to the medical office, Ms. Williams’ intended to retrieve her personal belongings until she observed their condition. Because they were water damaged and covered with mold, she abandoned them. She indicated much of the suite’s contents were damp and moldy. She stated she observed a broken window from which it appeared to her that the rain water had entered the suite. Ms. Williams specified and identified items placed on the tops of cabinets and desks in certain rooms that were wet and “water damaged.” While she was unable to recollect | ^exactly how many were ceiling tiles were displaced, she recalled that in her work area and in the
 
 *170
 
 lab there were many. Further, she recollected as to the first examination room, the ceiling tiles were out and “you could tell that’s how water came fishing in there.” When asked whether she could have worked in the environment as alleged by Lafayette, she responded “no” because “everything was gone” and the odor was offensive.
 

 Dr. Yount described the difficult circumstances under which they sought to salvage items and observed the water markings originating from the ceiling, the water “soaked” ceiling tiles and the growth of mold. She admitted that her earliest belief about the damage to her suite and belongings was incorrect. After several forays into the suite when she was able to make a closer inspection, items which she initially thought might be salvaged had to be discarded because they were damp and moldy. Dr. Yount observed on one occasion that individuals on the floor above her suite were throwing furniture and equipment out of windows into dumpsters. Walls were knocked out to the studs and the ceiling tiles removed in her suite as they had throughout the building. She believed that they were removed because they were damaged beyond repair. It appeared to Dr. Yount, based on her own visual assessment, that the rain water entered her suite from the ceiling, the windows and/or wall seepage. When asked about the air quality, she stated it was particularly unsafe for her patients because of the mold problem: “It was awful. It was just no way you could breathe in there. I certainly felt very uncomfortable in there, and would not have wanted anybody with a medical condition to have gone in there for any reason.” She stated that her equipment was full of mold and concluded it was dangerous for use.
 

 | ^Compelling testimony supporting the claim that Dr. Yount’s suite suffered direct physical damage was that of Kenneth Sutherland, Tenet’s Vice-President of Construction and Design, whose deposition testimony was read to the jury. He and his department were responsible for getting each of the Tenet buildings located in New Orleans operational, if practicable, following their damage assessment. As to the medical building, Mr. Sutherland testified that he inspected it shortly following the recession of the floodwaters. Based on his review of the premises and a report prepared by Halliwell Engineering for Tenet, which indicated architectural, electrical and mechanical damages to the building, he concluded there were non flood-related damages sustained to the building:
 

 Q: Mr. Sutherland, did the [Tenet] Medical Office Building West sustain wind damage as a result of Hurricane Katrina?
 

 A: Yes.
 

 Q: Describe that damage for me.
 

 A: Damage was broken windows, mechanical equipment on the roof was damaged, roof hatches were damaged. The roof itself received damage, and the exterior skin had what they call missile impact damage.
 

 Q: Wfiiat other types of damages were sustained to the Medical Office Building ]Vest which damages were not flood related?
 

 A: The ones I listed were the ones that were not water-damaged from the rising water.
 

 Q: Okay, did water get in the building, the Medical Office Building West, through either broken windows or the torn membrane of the roof, or broken hatches?
 

 A: Yes.
 

 Q: Did this cause mold and other environmental-type damages inside of the building?
 

 
 *171
 
 A: Yes, it did.
 

 Additionally persuasive evidence of the causation and damages issues is the inspection report of Lafayette’s own independent adjuster, Jeff Yearwood, which noted “visible wind storm damage to the office suite.” While we recognize that Lafayette disputes the inference from this entry, we cannot overlook that Lafayette did not offer Mr. Yearwood as a witness either by deposition or in person at the 114trial. Instead, Lafayette relied upon an interpretation of Mr. Yearbook’s observation by Joe Rizzo, an insurance adjusting expert. Mr. Rizzo’s interpretation supported Lafayette’s contention that any damages or losses to the suite were flood-related. But unlike Dr. Yount, Ms. Williams, Tenet’s Mr. Sutherland, or Mr. Yearwood himself, Mr. Rizzo did not personally inspect or observe the suite, its contents, or the medical office building. The substance of Mr. Rizzo’s testimony: raises a sufficient factual dispute to prevent a directed verdict, but, based on our own
 
 de novo
 
 review, we find that its persuasive value is diminished because it is not made on the basis of first hand observation.
 

 We conclude that the suite did sustain direct physical loss and damage as a result of the wind and rain, and not due to direct contact with the floodwaters. Further, we find these losses and damages, alone, would have and did cause a suspension in the operation of Dr. Yount’s medical practice.
 

 Dr. Yount paid the premium for the additional coverage for “business interruption” for the term of the policy. The general purpose of such insurance is to protect the earnings which the insured would have enjoyed had no interruption or suspension occurred. Generally, a business interruption is a temporary cessation or impairment of the operations of an established business.
 
 See Morton M. Goldberg Auction Galleries, Inc. v. Canco, Inc.,
 
 94-0734 (La.App. 4th Cir.1/31/95), 650 So.2d 801. Dr. Yount sustained her burden of proving by a preponderance of the evidence direct physical damage to her property in the leased suite sufficient to impair and suspend the operation of her medical practice.
 
 Rosell,
 
 549 So.2d at 844-845.
 

 For these reasons, we find an award of insurance proceeds under the business interruption coverage of the policy to be appropriate under the facts.
 

 115Z?«tf
 
 Faith Damages
 

 Dr. Yount asserts the trial court erred in granting a directed verdict in favor of Lafayette following its conclusion that the insurer did not act arbitrarily and capriciously in the handling of the plaintiffs insurance claim. The plaintiff contends penalties and attorney’s fees are recoverable pursuant to La. R.S. 22:658 and 22:1220 based on the insurance carrier’s untimely payment of the pharmaceutical claim, continual refusal to provide payment under the business interruption portion of the commercial policy, and misrepresentation in correspondence and court filings that no damage was sustained to Dr. Yount’s property.
 

 The law of Louisiana is clear insofar as it provides that an insured or claimant cannot recover penalties for failure to settle a claim, except in the limited circumstances provided by statute. La. R.S. 22:658 provides that all insurers shall pay the amount of any claim due any insured
 
 within thirty days of satisfactory proof of loss from the insured.
 
 Insurers are liable for penalties when the failure to make payment within thirty days after demand and
 
 satisfactory written proof of loss
 
 is found to be arbitrary and capricious, or without probable cause. La. R.S. 22:658 B(l). Under La. R.S. 22:1220, an insurer
 
 *172
 
 has a duty of good faith and fair dealing toward its insured, including the duty to adjust claims fairly and promptly. The insured is entitled to recover any general and special damages, and may recover penalties, occasioned by the insurer’s breach of these duties. La. R.S. 22:1220(B) and (C). These statutory provisions are penal in nature and, as such, must be strictly construed.
 
 Urology Clinic of New Orleans, Inc. APMC v. United Fire and Cas. Co.,
 
 08-0444, p. 3 (La.App. 4 Cir. 9/10/08), 993 So.2d 803, 807.
 

 |, r,The Louisiana Supreme Court recently reviewed the elements necessary for prevailing on a cause of action for penalties under La. R.S. 22:658.
 
 Louisiana Bag Company v. Audubon Indemnity Company,
 
 2008-0453 (La.12/2/08), 999 So.2d 1104. In order to prevail Dr. Yount must prove “that (1) an insurer has received satisfactory proof of loss, (2) the insurer fails to tender payment within thirty days thereof, and (3) the insurer’s failure to pay is arbitrary, capricious or without probable cause.”
 
 Louisiana Bag,
 
 at p. 6, 999 So.2d at 1109.
 

 The Supreme Court further noted that in those instances “when there are substantial, reasonable and legitimate questions as to the extent of an insurer’s liability or an insured’s loss, failure to pay within the statutory time period is not arbitrary, capricious or without probable cause.”
 
 Louisiana Bag,
 
 at p. 7, 999 So.2d at 1110.
 

 Relying on these principles and, again, turning to the law relative to directed verdicts, we determine the trial court was not manifestly erroneous or clearly wrong in granting a directed verdict in favor of Lafayette. Our review of the record indicates Lafayette took adequate measures in its adjusting of the claim. The insured property was inspected by Lafayette’s adjuster less than one week after the claim was submitted. A final inspection report was prepared by the adjuster within a reasonable period of time, especially when taking into account the inundation of insurance claims submitted with the insurance carrier following the unprecedented catastrophic event. Within days of receiving the inspection report, Lafayette provided a denial of the claim on the basis that the damages were flood-related and offered the insured the opportunity to provide evidence to the contrary. Subsequently, Dr. Yount took no further steps to fully apprise or provide clarification to Lafayette of the extent of damages. The record is absent any evidence Dr. Yount ever took measures to provide to the insurance carrier an 117itemization of damaged articles (i.e., furniture, office equipment), other than refrigerated pharmaceutical items. As correctly noted in the trial court’s Reasons for Judgment rendered in connection with the motions for directed verdict, a plaintiff seeking penalties under La. R.S. 22:658 and 22:1220 must prove that the insurance company received a satisfactory proof of loss. A satisfactory proof of loss is that which is sufficient to fully apprise the insurance carrier of the claim and the extent of damages.
 
 Talton v. USAA Cas. Ins. Co.,
 
 2006-1513, p. 15 (La.App. 4 Cir. 3/19/08), 981 So.2d 696, 707.
 

 “The determination that an insurer’s handling of a claim is arbitrary and capricious may not be disturbed unless manifestly erroneous/clearly wrong.... Because the determination of bad faith in an insurer’s evaluation of a claim or in refusing to settle a claim turns on the facts and circumstances of each case, great deference must be accorded to the trier of fact.”
 
 Coig v. Gregoire,
 
 2007-1296, pp. 4-5 (La.App. 4 Cir. 4/9/08), 989 So.2d 786, 789 (citation omitted).
 

 
 *173
 
 Given that the trial court concluded that Dr. Yount did not provide a satisfactory proof of loss, coupled with the undisputed evidence in the record regarding Lafayette’s measures to adjust the plaintiffs claim, we find that the trial court did not commit manifest error in finding that the insurance carrier did not act arbitrarily and capriciously. We find reasonable persons could not have reached a verdict in favor of Dr. Yount and against Lafayette as to the issue of penalties and attorney’s fees. Accordingly, we affirm the trial court’s ruling in this regard.
 

 Judicial Confession
 

 The plaintiff urges the trial court erred in granting Lafayette’s motion in limine to restrict the testimony regarding Dr. Yount’s economic loss to a two and one-half (2½) month period extending from August 29, 2005 until November 15, |1S2005, the day Dr. Yount went on staff with Tou-ro. Dr. Yount contends that the trial court erroneously concluded counsel for the plaintiff made a judicial confession during a court hearing on a discovery motion that Dr. Yount was seeking economic losses for a^ limited period of ten weeks. Dr. Yount’s expert economist was prepared to testify at trial that the losses extended for a period of one year.
 

 A “judicial confession” is a party’s explicit admission of an adverse factual element and has the effect of waiving evidence as to the subject of the admission. La. C.C. art. 1853. In order to effectuate such, the opposing party must have been led to believe the fact was not at issue or must have relied on the statement to his detriment, otherwise the party making the admission can withdraw the statement.
 
 Dolsen v. City of N.O.,
 
 559 So.2d 50, 51 (La.App. 4th Cir.1990). “A declaration made by a party’s attorney or mandatary has the same effect as one made by the party himself.” La. C.C. art. 1853,
 
 Revision Comments
 
 — 1981.
 

 The trial court, it seems, relied on Dr. Yount’s deposition testimony propounded on the issue of her first return to the practice of medicine two and one-half (2½) months after the storm. Lafayette emphasized the statement of Dr. Yount’s counsel, Mr. Milner, made during the following exchange at a March 2, 2007 pretrial hearing on a motion to compel:
 

 MR. BARRY: So we’re entitled to the entire picture. All they’ve given us — all they have given — are the tax returns that don’t even go to the present. Dr. Yount—
 

 THE COURT: Wait, let me, let me— Your loss of income claim, is for a specific period of time?
 

 MR. MILNER: Yes, Your Honor.
 

 THE COURT: From August—
 

 MR. MILNER: From August 29th through November 15th, 2003[sic]—
 

 MR. BARRY: 2005
 

 MR. MILNER: Pardon me, 2005, But—
 

 119MR. BARRY: Are you limiting your claim — Because I don’t want anything after November whatever. I mean, if the claim is limited to those dates, then fine. I don’t need—
 

 THE COURT: Basically, a two-and-a-half month claim.
 

 MR. MILNER: That’s correct.
 

 THE COURT: Okay.
 

 MR. MILNER: Until she started her practice again.
 

 THE COURT: Okay. Now—
 

 Although it is not disputed that the statement of Dr. Yount’s counsel indicates that the request for damages was limited to ten weeks, upon review of the record as a whole, we conclude the trial court erred in determining counsel for plaintiffs state
 
 *174
 
 ments constituted a judicial confession. Mr. Milner was substituting for the attorney directly handling Dr. Yount’s case, and it is clear from Lafayette’s subsequent trial preparation that it did not detrimentally rely on Mr. Milner’s statements, as it was fully prepared to challenge any losses beyond the ten-week period.
 
 Dolsen,
 
 559 So.2d at 51. Following the pretrial hearing, Lafayette had ample notice that Dr. Yount was still pursuing financial losses for a period of one year for the interruption of her business. Three months post-hearing, Lafayette retained an expert to analyze Dr. Yount’s financial documents for a five-year period. It prepared its defense for trial with the intent of discrediting the report of Dr. Yount’s economic expert that concluded Dr. Yount specifically suffered losses over a one-year period of time.
 

 Since we have concluded the trial court procedurally erred in granting the motion in limine, we turn to the sufficiency of the award based on the duration of the interruption in Dr. Yount’s medical practice. In her brief, Dr. Yount requests that, based on its evidentiary proffer following the adverse ruling on the motion in limine, this court adjust upward the business income damage award to $184,462.00 in the absence of a remand. However, Dr. Yount did not assign as error in her ^“Specification of Errors” the insufficiency of the damage award. She only assigned as error the fact the trial court committed legal error in finding that her counsel had made a judicial confession as to duration for the request of damages.
 

 We nevertheless have considered the matter and conclude that the record supports that Dr. Yount’s losses were in fact limited to the ten-week period as restricted by the trial court. Dr. Yount failed to sustain her burden of proving her economic losses exceeded the date she retained other employment. We find no compelling evidence to justify an increase in the jury’s damage award, even if we had the authority to increase the award of damages in this case.
 

 Dr. Yount demonstrated throughout the time at issue in these proceedings her concern and care for her patients and for her employees. Before Thanksgiving 2005, she was once again actively engaged in practicing medicine in New Orleans. This was at a time when New Orleans was in dire need of medical providers to render care to those returning residents, and other persons, committed to the City’s rebuilding and recovery. Her selfless readiness in making herself available to her patients may well have reduced the amount she could have recovered. Her financial losses surely exceed the amount of damages which we affirm today, but we are certain that the damage award compensates her to the full extent of the coverage provided by Lafayette for the period of time her practice was suspended due to the damage and loss of her personal property.
 

 DECREE
 

 We reverse and vacate the trial court judgment as to the grant of a directed verdict in favor of Dr. Yount on the issues of causation and coverage. We also reverse and vacate the trial court’s ruling on the motion in limine in favor of |21 Lafayette relative to the duration of Dr. Yount’s economic losses at issue in these proceedings. We affirm the directed verdict in favor of Lafayette on the issue of bad faith. Based on our
 
 de novo
 
 review of the issues on which we find that the trial judge erred, we have arrived at the same point as the jury as to quantum and, therefore, affirm the jury’s award of $68,472.00, plus the additional $1,600.00 added to the
 
 *175
 
 award by stipulation, for a total award in the amount of $70,072.00.
 

 Accordingly, we render judgment herein in favor of the plaintiff, Beverly B. Yount, M.D., APMC, and against the defendant, Lafayette Insurance Company, in the 'full amount of SEVENTY THOUSAND SEVENTY-TWO ($70,072.00) DOLLARS, with legal interest thereon from the date of judicial demand until paid, |a2and for all costs of these proceedings.
 

 AFFIRMED IN PART, REVERSED AND VACATED IN PART, AND RENDERED.
 

 ARMSTRONG, C.J., concurs.
 

 ARMSTRONG, C.J., concurs.
 

 hi would affirm the judgment of the trial court. Therefore, I respectfully concur in the result reached by the majority.
 

 [1]
 

 . This is commonly referred to as "business interruption insurance”.
 

 [2]
 

 . For convenience, this opinion will refer to the plaintiff and its sole shareholder as "Dr. Yount”.
 

 [3]
 

 . The record is conflicting as to whether the medical building had three or four stories.
 

 [4]
 

 . In October, 2006, Lafayette removed the case to federal court alleging federal jurisdiction was proper pursuant to the Multiparty, Multiforum Trial Jurisdiction Act ("MMTJA”).
 
 See Yount v. Lafayette Ins. Co.,
 
 Civil Action No. 06-7382, United States District Court for the Eastern District of Louisiana. Relying on jurisprudence that Hurricane Katrina does not constitute an accident for purposes of the MMTJA, the United States District Court granted the plaintiff's motion to remand the case back to Civil District Court for the Parish of Orleans.
 

 [5]
 

 . Additionally, Lafayette filed a motion for summary judgment prior to trial on the issue of bad faith coverage. The trial court denied the motion finding that, although Dr. Yount had "in fact sustained a direct physical loss of her insured property,” there remained factual issues as to whether the loss was caused by flood, wind, or a combination of both.