CAJUN CONTI LLC, CAJUN
CUISINE 1 LLC, AND CAJUN
CUISINE LLC D/B/A OCEANA
GRILL

VERSUS

CERTAIN UNDERWRITERS
AT LLOYD'S, LONDON AND
GOVERNOR JOHN B.
EDWARDS IN HIS OFFICIAL
CAPACITY AS GOVERNOR
OF THE STATE OF
LOUISIANA, AND THE STATE
OF LOUISIANA

\*          NO. 2021-CA-0343

\*          COURT OF APPEAL

\*          FOURTH CIRCUIT

\*          STATE OF LOUISIANA

\*

\*

\* \* \* \* \* \* \*

**BELSOME, J., DISSENTS WITH REASONS**

Regrettably, I must dissent from the majority's opinion.  Finding no ambiguity in the language of the insurance policy, or manifest error in the refusal to apply coverage, I would affirm the district court's judgment denying Oceana's petition for declaratory judgment.

*Ambiguity*

While the majority argues that the language is open to more than one reasonable meaning and is ambiguous, the jurisprudence and plain language of the Policy do not support that contention.  The Policy provision related to Business Interruption coverage reads in pertinent part:

> We will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.' The 'suspension" must be caused by direct physical loss of or damage to property at premises…

The contractual language in question here is not defined in the Policy, but has been interpreted by numerous courts applying Louisiana law, in the context of business interruption coverage due to COVID-19, without a finding of ambiguity. Two recent cases, *Grand Isle Partners, LLC v. Assurant Insur. Agency*, No. CV 21-505, 2022 WL 179467 (E.D. La. Jan. 20, 2022), and *Muriel's New Orleans,*

1

*LLC v. State Farm Fire and Casualty Co.*, CV 20-2295, 535 F.Supp.3d 556 (E.D. La. Sept. 21, 2021), involved restaurants seeking insurance coverage for loss of business income due to COVID-19.[1]  Even though the federal court cases are not binding on this Court, I find the sound reasoning to be persuasive.   In the past, although not in a COVID-19 case, this Court has rejected the argument that the term "physical loss of or damage to" was ambiguous when determining coverage in a business interruption dispute.  *Yount v. Lafayette Ins. Co.*, 2008-0380 (La.App. 4 Cir. 1/28/09), 4 So.3d 162.

Further, other policy language further supports interpreting the term as unambiguous.[2]  In particular, the Policy declares that Business Income will be paid for the "suspension" of "operations" during the "period of restoration."[3]  As defined in the Policy, the period of restoration contemplates Oceana experienced a tangible alteration to the property that required repair, rebuilding, or replacement. Moreover, the Policy contains a specific exclusion for loss or damage caused by delay or loss of use.[4]

---

[1] In *Grand Isle,* the court found that "'physical loss of or damage to' property typically requires demonstrable, physical alteration of the property." *Grand Isle*, 2022 WL 179467 at *4. Likewise, in the *Muriel's* case, the court recognized that case law has consistently interpreted "physical loss or damage" to require a tangible or corporeal loss of property.  *Muriel's*, 535 F.Supp. 3d at 567; *see also Q Clothier New Orleans, L.L.C. v. Twin City Fire Ins. Co.*, CV 21-30278, 2022 WL 841355 (5th Cir. 3/22/2022); *Dickie Brennan & Co., LLC v. Zurich American Insurance Co.*, CV 21-434, 2021 WL 6061917 (E.D. La. December 20, 2021) (COVID-19 caused losses are strictly economical).

[2] "An insurance contract is to be construed as a whole and each provision in the contract must be interpreted in light of the other provisions." *Sims v. Mulhearn Funeral Home, Inc.*, 07-0054, p. 8 (La. 5/22/07), 956 So.2d 583, 589.

[3] The Policy defines the "period of restoration as commencing 72 hours after the physical loss or damage occurs and continuing until the date the property is "repaired, rebuilt, or replaced."

[4] It reads, in pertinent part:

> A.  When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy.
>
> B.  Exclusions
>
> > 1.   We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of other causes or event that contributes concurrently or in any sequence to the loss.
> >
> > ***

2

Given that both the Policy language and jurisprudence are clear, I do not find that the district court erred when it declined to find ambiguity in the Policy language.

### Direct Physical Loss of or Damage to Property

Next, I do not find manifest error in the district court's determination that there was no direct physical loss of or damage to Oceana's property due to COVID-19. Several witnesses testified at trial. The witnesses most relevant to the issue before this Court are Moe Bader, Dr. Lamuel Moye, Dr. Allison Stock, and Dr. Brian Flinn.

Oceana's general manager, Moe Bader, testified that he was responsible for the daily operations at Oceana Grill. He explained the heightened safety protocols, which included cleaning the surfaces in the restaurant with disinfectants. Mr. Bader also acknowledged that the premises was never tested for the presence of COVID-19 and there was no tangible loss of property such as chairs, tables, or any other restaurant equipment.

Oceana also presented the testimony of Dr. Lemuel Moye. Dr. Moye was accepted by the district court as an expert in medicine, biostatistics, and epidemiology. Using a Poisson distribution[5] analysis Dr. Moye testified that based on his calculations, using the rate of infection in the City and population, there was a scientific probability that at least one infected person entered the restaurant a day during the restaurants daily operations. Dr. Moye described the damage COVID-19 causes to property as a "physical transformation involving the healthful use of property." During cross-examination, he did concede that the contamination of the

---

2. We will not pay for loss or damage caused by or resulting from any of the following:

    \*\*\*

    **b. Delay, loss of use or loss of market.** (emphasis supplied).

[5] Poisson distribution is a statistical tool used to predict the number of times that a given event occurs within a certain interval or physical space.

3

property inside of the restaurant may be cleaned with chemicals. Nevertheless, he also stated that even though efforts are made to disinfect the surfaces they are continuously re-contaminated and damaged by the virus.

Testifying at trial for Underwriters was Dr. Allison Stock a Ph. D. in epidemiology and Dr. Brian Flinn a Ph. D. in materials engineering.[6] Dr. Stock served as an epidemic intelligence officer at the Center for Disease Control where she was involved with the investigation of SARS-1. She explained that the virus is transmitted from person to person and as of the date of her testimony there had been no known infections caused by surface-to-human transfer. She also stated that disinfecting the surfaces kills the virus, which allows the inanimate items to be re-used. Dr. Flinn concluded that there was no evidence to support the virus caused a chemical bond to the surfaces of the restaurants property to alter and damage the property. He agreed with Dr. Stock that disinfectants reliably eliminate the virus from surfaces.

In support of its position that it suffered "direct physical loss" when COVID-19 rendered its premises uninhabitable, Oceana cites to this Court's, and this author's, opinion in *Widder v. Louisiana Citizens Prop. Ins. Corp.*, 2011-0196 (La. App. 4 Cir. 8/10/11), 82 So.3d 294, *writ denied*, 2011-2336 (La. 12/2/11), 76 So.3d 1179, and the Eastern District's decision *In re Chinese Manufactured Drywall Prods. Litig.*, 759 F.Supp.2d 822 (E.D. La. 2010). However, its reliance is misplaced because in those cases the courts found a physical alteration of the insured's property that rendered the property uninhabitable or useless, which did not occur in this case.[7]

---

[6] Materials engineering is the study of materials using chemistry and physics.

[7] In *Widder*, Marcia Widder filed a claim with her homeowner's insurer Louisiana Citizens Property Insurance Corporation ("LCPIC") for damages caused by inorganic lead contamination. *Widder*, 2011-0196, p. 1, 82 So.3d at 295. Her home was rendered uninhabitable until gutted and remediated. *Id.* LPIC denied the claim for failure to establish that there was a direct physical loss to trigger coverage under the policy. *Id.* at p. 2, 82 So.3d at 295. The district court granted a motion for summary judgment in favor of LPIC on that issue. *Id.*

Similar to the instant case, the court in *Q Clothier New Orleans LLC v. Twin City Fire Insurance Co.*, No. CV 20-1470, 2021 WL 1600247 at *7 (E.D. La. 4/23/21), explained "COVID did not condemn plaintiff's property as unusable in the same regard as *In re Chinese Drywall* because effective health measures such as social distancing, capacity limitations, curbside pickup alternatives, and mask wearing allow for businesses to safely continue operation." *See also Coleman E. Adler & Sons, LLC v. Axis Surplus Ins. Co.*, No. CV 21-648, 2021 WL 2476867, at *2 (E.D. La. 06/17/21)(closures "mandated by civil authorities due to the COVID-19 pandemic did not cause direct physical loss or damage because their injury is purely economic in nature."). Additionally, Oceana had employees, vendors, and eventually a limited number of patrons on site, which defeats the contention that the property was uninhabitable and useless as in *Widder* and *In re Chinese Drywall*.

### Conclusion

Considering the evidence and testimony presented to the district court, it is clear that it found no ambiguity in the Policy language, which I find to be legally correct. Then, applying the Policy language to the facts of this case, the district court rejected the opinions of Oceana's expert, Dr. Lemuel Moye, and found that Oceana did not sustain a physical loss to or damage to its property. Given the great

---

Addressing the correctness of that ruling, this Court reasoned that the type of loss suffered by Ms. Widder was analogous to the loss experienced from Chinese drywall. This Court recognized that like the gaseous fumes released from Chinese drywall, the inorganic lead contamination made the Widder home unusable and uninhabitable even though physically intact. This Court wrote:

> In *In re Chinese Manufactured Drywall Products Liability Litigation*, the court found that the presence of Chinese drywall, from which gaseous fumes were released, did in fact constitute a direct physical loss. The court stated that when a home has been rendered unusable or uninhabitable, physical damage is not necessary. *See Ross v. C. Adams Construction & Design*, 10-852 (La.App. 5 Cir. 6/14/11), 70 So.3d 949 (Although the Chinese drywall is physically intact and functional, its inherent qualities require it to be taken down and replaced. Therefore, there was direct physical loss.).

*Id.* at p. 4, 82 So.3d at 296.

5

deference afforded to the district court in its factual findings, I do not find its ruling to be manifestly erroneous or clearly wrong.  Accordingly, I would affirm the trial court's judgment.

For these reasons, I respectfully dissent.