989 So.2d 786 (2008)
Dori S. COIG and Marco Coig
v.
Joann Richs GREGOIRE and National Automotive Insurance Company.
No. 2007-CA-1296.
Court of Appeal of Louisiana, Fourth Circuit.
April 9, 2008.
*787 David L. Patron, Phelps Dunbar LLP, New Orleans, LA, for Plaintiffs/Appellees.
Gary T. Breedlove, Cimini & Associates, Metairie, LA, for National Automotive Insurance Company.
Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge, CHARLES R. JONES and Judge TERRI F. LOVE.
JOAN BERNARD ARMSTRONG, Chief Judge.
This appeal arises from a suit for property damages allegedly sustained by the plaintiffs when their parked Oldsmobile Aurora automobile was struck by a car driven by the defendant. For the reasons that follow, we amend and affirm the judgment of the trial court.
On March 21, 2003, Dori S. Coig and Marco Coig filed suit against Joann Richs Gregoire and her liability insurer, National Automotive Insurance Company (NAIC), alleging that on or about March 23, 2003, in the late afternoon, Ms. Coig had parked her car in the Wal-Mart parking lot located on West Judge Perez Drive in Chalmette, Louisiana, when a car owned and operated by Ms. Gregoire struck the Coigs' car. The plaintiffs claimed that they had previously furnished NAIC with satisfactory proofs of loss including invoices, police and expert reports and other documentation to prove the damages they sustained in the collision, to no avail, entitling them to damages, penalties and reasonable attorney's fees for NAIC's arbitrary *788 and capricious refusal to pay the claim. Plaintiffs also sought punitive and exemplary damages, penalties and attorneys fees pursuant to La. C.C. art. 2315.4[1]
NAIC answered with a general denial, and claimed that there was a reasonable basis for its denial of the claim. NAIC also denied that Ms. Gregoire was under the influence of alcohol at the time of the collision and claimed that its insurance policy does not provide indemnity for exemplary damages.
Following a bench trial, the trial court found Ms. Gregoire liable for the damage to the plaintiffs' automobile, found NAIC to have been in bad faith for its arbitrary and capricious failure to provide a rental car as well as its denial of the property damage claim, and rendered judgment on June 23, 2004[2] in favor of the plaintiffs and against NAIC for the following:

Damage to Transmission $1,695.75
Car Rental Fee 600.00
Police Report 15.00
Loss of Use 500.00
Registered Mail 4.65
Penalties 1,500.00
Attorneys' Fees 1,500.00
Expert Fees 250.00

The trial court also awarded interest from the date of judicial demand and all costs of the proceedings. The trial court granted NAIC's Motion for a Suspensive Appeal on July 28, 2004.[3]
For the purposes of this appeal, the parties do not dispute that Ms. Gregoire was insured with NAIC and was responsible for the collision that took place in the parking lot. NAIC concedes that although at trial it disputed that the transmission damage was related to the accident, the trial court was justified in reaching its conclusion that the transmission damage was accident-related.
NAIC assigns as error the trial court judgment awarding penalties and attorney's fees to the plaintiffs where there was a bona fide dispute as to whether the transmission damage was related to the accident. While the record does not contain written reasons for judgment, the trial court made certain findings on the record at the conclusion of the trial:
The Court, after hearing all of the testimony and reviewing the exhibits, finds for the plaintiff. Court [sic] finds in the following manner: First, that the full repairs in the amount of $1,695.75 shall be paid; the sum of $600 as rental shall be paid; full costs of court, whatever that may be along with the cost for the police report and the certified mail shall be paid.
I'm going to award the sum of $250 for expert fee. And for loss of use I'll award the sum of $500. For exemplary damages under Article 22:658[4] I award the sum of $1,500. *789 And attorney's fees as a result of the bringing of the action, I award the sum of $1,500.
The trial court then made clear that the expert fee was awarded for plaintiff's expert, Mr. Vincent J. Sclafani.
La.R.S. 22:658 has been held to be a penal statute, subject to strict construction. See Holmes v. Motors Ins. Corp., 277 So.2d 472 (La.App. 4 Cir.1973), citing Headrick v. Pennsylvania Millers Mut. Ins. Co., 257 La. 1101, 245 So.2d 324 (1971). In order to prevail under La.R.S. 22:658, the claimant must establish that the insurer received satisfactory proof of loss, failed to pay the claim within thirty days of receipt, and that the failure to pay the claim was arbitrary, capricious, or without probable cause. Brinston v. Automotive Cas. Ins. Co., 96-1982 (La.App. 4 Cir. 12/3/97), 703 So.2d 813, 816.
A trial court's conclusion as to the imposition of statutory penalties is a fact question that this Court will review under the manifest error standard. The determination that an insurer's handling of a claim is arbitrary and capricious may not be disturbed unless manifestly erroneous/clearly wrong. Id. Because the determination of bad faith in an insurer's evaluation of a claim or in refusing to settle a claim turns on the facts and circumstances of each case, great deference must be accorded to the trier of fact. Lafauci v. Jenkins, 01-2960, pp. 13-14 (La.App. 1 Cir. 1/15/03), 844 So.2d 19, 28-29. See also, Patin v. Imperial Lloyds Ins. Co., 95-841, pp. 10-11 (La.App. 3 Cir. 1/17/96), 670 So.2d 238, 244
Our review of the record in its entirety convinces us that the evidence supports the trial court's conclusion.
The parties stipulated to the police report of the accident, and that (1) Ms. Gregoire was driving while impaired at the time of the accident; (2) Ms. Gregoire had died prior to the trial; (3) La.C.C. art. 2315.4 damages were not covered under NAIC's standard auto policy; (4) the amount of repairs for the transmission was $1,695.75; (5) the cost of car rental was $600; (6) Ms. Gregoire was at fault in the collision; and (7) NAIC paid plaintiffs $1,052.50 in response to the original claim.
Mrs. Coig testified that at the time of the accident she was three months pregnant, and had parked her car in the Wal-Mart *790 parking lot to shop at the store. When she returned to her car about twenty minutes later, she saw two Wal-Mart employees and Mrs. Gregoire, who told her she would take care of the damage. Mrs. Coig noticed body damage to the car's rear bumper and, when she drove the car from the scene of the accident, noticed a bumping sensation when shifting into reverse, and that the "check engine light" lit on the car's dashboard. She spoke to Jan Hackett of NAIC two days after the accident, who told her to take her car to a mechanic shop of her own choice. Rod Nunez of Central Claims Service, Inc. inspected the car for Ms. Hackett and in the "remarks" section of the appraisal notes, "Owner stated that the engine warning light came on after this accident. We donot [sic] know why." Mrs. Coig received NAIC's check dated April 8, 2002 in the amount of $605.07 for the body work, and had that work performed at Rich's Body Shop. After the body work was completed, the car was sent to Mossy Motors so that the transmission and "check engine" light issues could be investigated. After two weeks, Ms. Coig was advised that the insurer had not yet sent anyone to evaluate the problem, and she began phoning NAIC. Mrs. Coig testified that she called Ms. Hackett without response, and began documenting her phone calls in mid-June. She called "continuously" and left several voicemails, seeking a rental car so that she could attend appointments with her obstetrician, and an adjuster who would examine the car at Mossy Motors. She estimated that between late May through September, she made at least fifty phone calls, some days calling several times, without having received a response from NAIC. She was becoming upset with the lack of response, and turned the matter over to her husband.
A FAX cover sheet dated June 4, 2002 from Central Claims Service to Ms. Hackett notes:
Vehicle is at Mossy Motors XXXXXXXXXX. Jeff is the service advisor. The shop cannot prove to us (Rod) that the additional repairs needed are related to the accident on 3/23/02. We feel that we must deny the supplement request for $2007.80 until some technical authority can relate the broken transmission mounts and transmission speed sensor damage to the 3/23/02 accident.
On June 20, 2002, Ms. Hackett assigned the appraisal to Delta Appraisal Service, with the following special instructions:
Ronnie, Central has looked at this vehicle. Mossy Olds is now saying suppl. needed for trans sensor and mounts over $2000.00. Central cannot relate trans. Dmg. to our loss. Call me. We need you to photo sensor and mounts. Vehicle was rearended in [illegible  the handwritten figure could be 2000 or 2002]. I'm also faxing Central's appr. and Mossy repair sheet on suppl.
On October 2, 2002, NAIC send Rich's Body Works an additional check in the amount of $402.43 for body repairs to Mrs. Coig's car. Ultimately, the Coigs authorized Mossy to make the necessary transmission repairs for which they paid $1,695.75.
Mrs. Coig identified the demand letter dated January 23, 2003 that she forwarded to NAIC along with a copy of the police report, proof of her rental car expenses, Mossy Motors' invoice for the transmission repair and a letter from the Coigs' expert mechanic, Mr. Sclafani, Mossy Motors' Director of Parts and Service, concerning the necessity for that repair. Mr. Sclafani's letter, dated November 27, 2002, advised NAIC as follows:
To Whom It May Concern:

*791 The 1995 Oldsmobile Aurora, Vehicle ID # 1G3GR62CS54130460, was inspected by myself [sic] and a Technician.
From my experience of forty-two years in the automobile industry, I have inspected thousands of vehicles that were in collisions. Many rear-end collisions do cause engine and transmission mounts to break.
I had inspected the vehicle in question on many occasions prior to the date of the collision and there were no prior problems with the transmission mounts.
It is my opinion that the damage to the transmission mounts of the above vehicle is consistent with damage caused by a rear-end collision. I therefore conclude that the damage to the transmission mounts was caused by the rear-end collision of March 23, 2002. There was also a broken wire in the transmission that was also the result of the collision.
Mr. and Mrs. Coig testified at trial that they maintained the car properly and that they had not experienced the transmission problem prior to the accident, nor had the check engine light activated before the collision.
NAIC contends that it denied the transmission claim in good faith, relying on the opinion of appraiser Rodney Nunez. Mr. Nunez testified at trial that he has been an automobile appraiser for about twelve or thirteen years, during which time he has appraised both body and mechanical damage. He was accepted without objection as an expert in the field of auto diagnostics and repair appraisal. He was employed during the relevant time period by Central Claims, an agency that writes appraisals on property, automobiles, boats, trains and planes for approximately twenty-four different insurance companies.
Mr. Nunez testified from his records that the date of the accident was March 23, 2002, and the claim was assigned to him on March 25, 2002. He saw the vehicle on the March 27 or 28, at Mrs. Coig's place of employment, photographed the damaged area and wrote down the damage he observed. He did not take any diagnostic equipment to the site and was not in a position to diagnose problems, but was advised by either Mrs. Coig or the body shop that the check engine light had activated. In cases like the instant case, where the owner complains that a warning light activated, his practice is to advise the insurer that the vehicle should be taken in as soon as possible to find out why the light activated. He noted the warning light complaint on the estimate, which he faxed to Ms. Hackett on April 1, 2002.
On May 31, 2002, he received a supplemental request for additional body work from the body shop. Mr. Nunez originally had observed a dented bumper cover. The body shop removed the cover and discovered what the expert described as "a little dink in the back", and a bent tip on the reinforcement. Mr. Nunez honored the request for supplemental payment. Mr. Nunez advised the body shop that, if it did not perform diagnostic work on trouble lights or transmissions, the car should be towed to a mechanic of Mrs. Coig's choice to be checked.
Mr. Nunez testified that the car was moved to Mossy Motors on June 2, 2002. On cross-examination, Mr. Nunez testified that Mossy should be a place that knows how to diagnose and repair the check engine light issue. On June 4, 2002, Mossy Motors' employee, Jeff Smith, called Mr. Nunez to make a supplemental request, and confirmed this request in writing. The supplemental request included replacement of a turbine speed sensor, and left and right transmission mounts. Mr. Nunez advised Mossy Motors' representative that Mossy Motors would have to prove to Central Claims that these problems *792 were caused by the accident. Mr. Nunez went to Mossy to perform an additional inspection shortly after having received the request. The broken mounts were sitting on a work bench and the transmission had not been touched. Mr. Nunez looked at the mounts and noticed residue in the cracks, indicating to him that the damage had existed "for a while." On cross-examination, he described the body shop's cleanliness as "marginal" and admitted that the car had remained in the body shop from late March to early June. The trial court could have concluded from this testimony that the dirt in the cracks found on the transmission mounts came from the body shop, and was not evidence of prior damage to the mounts. Mr. Nunez noted that one of the mounts did not appear to be damaged, and was told by Mr. Smith that it is the shop's policy to replace both mounts if one is broken. Mr. Nunez concluded that the accident did not cause the mechanical damage.
Mr. Nunez testified that he checked with every mechanical shop in Chalmette, all of which had been in business for twenty years: Car Craft, Custom and Fradella's, as a result of which he asked Mossy Motors to run a test and take down the transmission to see if it had been damaged by the collision. He asked the two or three other appraisers working for his company about the transmission issue, and none had heard of a low impact collision's having caused broken transmission mounts or a broken sensor wire. However, none of the people he questioned had inspected the Coigs' automobile.
He testified that after he learned of the instant litigation, he conducted further research and discovered that certain General Motors and Ford transmission wires could become "crispy" over time and the wires and mounts could break on low impact or even for no reason at all. Mr. Nunez testified that he first learned of this "crispy" issue from either Mr. Smith or another of the Mossy Motors mechanics. Mr. Nunez admitted on cross-examination that it was his responsibility to try to find out why the wire broke. Mr. Nunez testified that he was not called back to examine any alleged damage inside the transmission; he never saw the broken wire or bad speed sensor that Mossy Motors claimed was damaged in the accident. He testified that at the end of August, 2002, he reported to Central Claims as follows:
Upon reinspection of the transmission mounts of this vehicle, we noted that the right and left mount rubber bindings were separated from the metal portion of the mounts. We feel that if these mounts were in good condition prior to this accident they would not have separated due to a relatively low impact of this type. We also could not find an obvious problem with the transmission tail end, meaning this is the other mount I said there was nothing wrong with, which the shop agreed. And I'm recommending that they deduct that, the cost of that mount that was not bad that they said was bad from this request. And I finally say payment of any or all of this claim would be a goodwill gesture.
Mr. Nunez testified that he did not tell NAIC not to pay the supplemental claim, but said payment would be a goodwill gesture, essentially meaning that from the evidence he had examined, there was not enough proof to support a conclusion that the accident caused the transmission damage. He admitted on cross-examination that because of the car's pre-existing condition, a low impact collision could cause the transmission damage of which plaintiffs complained.
Ms. Jan Hackett testified that during the relevant time period she was an insurance adjuster for NAIC. It was her job to *793 handle insureds, collisions and claims of third party property damage. She testified from her claim file that she received notice of the claim on March 28, 2002, and performed her initial investigation by speaking to Mrs. Coig. She took Mrs. Coig's statement, but the appraisal had been assigned to Central Claims, an outside adjusting firm. Ms. Hackett received the appraisal on April 4, 2002 and took Ms. Gregoire's statement on April 5, 2002. Ms. Gregoire confirmed the loss, and Ms. Hackett requested a check for the original estimated cost of repair, $650.07. At that point, she considered the file closed. On May 23, 2002, Mrs. Coig called Ms. Hackett requesting that she fax an appraisal to the body shop, which Ms. Hackett did. The same day, another NAIC adjuster received a request from the body shop for a supplemental body repair, and Ms. Hackett testified that the other adjuster gave the body shop Central Claims' contact information. She testified that she did not receive paperwork for the $402.43 supplement until October second, and called the body shop for verification. She claims that she personally had not received the supplemental request prior to that time, and testified that "A lot of times mail comes in, supplements. If it doesn't have a claim number on two [sic], it gets put to another file. I don't know what happened to it." Upon receipt of the supplemental FAX, Ms. Hackett requested payment.
Ms. Hackett testified that in the meantime she had spoken with Mrs. Coig about mechanical damage to the car, and that Mrs. Coig advised her she would take the car to Mossy Motors. On June 4, 2002, Ms. Hackett spoke with Rod Nunez, who advised her that Mossy had done diagnostic tests and concluded that the car had engine problems that could incur repair costs of approximately $2,000. She did not act on the request at that time for lack of proof. She asked Mr. Nunez to re-appraise the car by written request dated June 19, 2002. She also testified that on June 4, 2002, she received a FAX from Mr. Nunez expressing his opinion, based on which she declined payment. She spoke with her NAIC claims manager, who suggested that another appraiser conduct an independent appraisal. At that time, NAIC contacted Delta, who, according to Ms. Hackett, sent Ronnie Evans to examine the car. Ms. Hackett testified that Mr. Evans "had also gotten involved in this and he sent me something back." This testimony was objected to at trial, since there was no evidence that Mr. Evans examined the car or made a report of his findings. When Ms. Hackett admitted on questioning by the trial court that she did not recall having received a report from Delta, the trial court refused to admit the hearsay evidence.
Mrs. Hackett then testified that Mr. Nunez made another inspection and rendered a report on August 28, 2002. Based on that report, Ms. Hackett and her NAIC claims manager decided to reject the claim as unrelated to the accident.
Mr. Sclafani was accepted without opposition as an expert in automotive diagnosis. He examined the car with a Mossy Motors technician. He noted a computer code indicating a turbine speed sensor circuit fault. He testified that a wire lead had broken, and that this kind of breakage can happen when a car is jolted. He also noted problems with three transmission mounts. He stated his opinion that the type of rear-end collision described in this case could break the mounts, and that he had seen situations in which the turbo sensor wire on an Aurora would break in a minor collision.
Mr. Sclafani testified that he was familiar with the plaintiffs' car from maintenance work performed by Mossy Motors. *794 He reviewed the Mossy Motors file and did not see any evidence of prior transmission work. He opined that because the engine light did not activate until after the collision, the transmission mount and turbine speed sensor faults were caused by the collision of March 23, 2002. On cross-examination, he noted that he had seen this type of damage caused when the body damage amounted to anything from a few hundred dollars to $5,000. He also opined that damage to the engine mounts and transmission sensor would be more likely if the damaged car had been parked at the time of the rear-end collision. Mr. Sclafani also noted that the damage to the rear bumper indicates an impact of at least two-and-a-half to five miles per hour.
According to Mr. Sclafani, the transmission problems would have manifested themselves earlier had they been related to any prior accident.
Based on the evidence adduced at trial, and on our review of the record in its entirety, we find that the trial court's conclusion that NAIC is liable for penalties under La.R.S. 22:658 is reasonable. Mr. Nunez admitted at trial that further research he conducted after the commencement of this litigation supported the conclusion that the transmission damage complained of could have been caused by a minor impact. There is no evidence in the record that he could not have done this research prior to having submitted his negative recommendation to Ms. Hackett. Ms. Hackett admitted that although, after having received Mr. Nunez's recommendation against payment of the cost of the transmission repair, she felt the need to have a second independent appraisal performed by Delta, she denied the claim based solely on Mr. Nunez's evaluation. However, we note that, as a matter of law, the statutory penalty provision in effect at the time of the accident and the adjustment of the insurance claim limited the penalty to twenty-five percent[5] of the difference between the amount paid or tendered and the amount found to be due, or $423.94, plus ten percent of the plaintiffs' alternative transportation costs, or $60.00. Thus, we are compelled to reduce the $1500 penalty awarded by the trial court to $483.94. In all other respects, we affirm[6] the judgment of the trial court.
AFFIRMED AS AMENDED.
NOTES
[1] "In addition to general and special damages, exemplary damages may be awarded upon proof that the injuries on which the action is based were caused by a wanton or reckless disregard for the rights and safety of others by a defendant whose intoxication while operating a motor vehicle was a cause in fact of the resulting injuries." La.C.C. art. 2315.4.
[2] The trial court signed the judgment on June 29, 2004.
[3] Because of various difficulties attributable to the aftermath of Hurricane Katrina which caused devastating damage to the area, and the necessity that the record and transcript be restored in Texas, the record was not lodged in this Court until late October of 2007. The briefing schedule was continued, and the briefs were filed timely.
[4] At the time of the accident and NAIC's adjustment of the claim, La.R.S. 22:658 provided in pertinent part: A. (1) All insurers ... [subject to exceptions not relevant to this case] shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest.... B. (1) Failure to make such payment ... or failure to make a written offer to settle any property damage claim, ... within thirty days after receipt of satisfactory proofs of loss of that claim, ..., when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of twenty-five percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, ... or, in the event a partial payment or tender has been made, twenty-five percent of the difference between the amount paid or tendered and the amount found to be due.... (4) Whenever a property damage claim is on a personal vehicle owned by the third party claimant and as a direct consequence of the inactions of the insurer and the third party claimant's loss the third party claimant is deprived of use of the personal vehicle for more than five working days, ... the insurer responsible for payment of the claims shall pay, to the extent legally responsible, for reasonable expenses incurred by the third party claimant in obtaining alternative transportation for the entire period of time during which the third party claimant is without the use of his personal vehicle. Failure to make such payment within thirty days after receipt of adequate written proof and demand therefor, when such failure is found to be arbitrary, capricious, or without probable cause shall subject the insurer to, in addition to the amount of such reasonable expenses incurred, a reasonable penalty not to exceed ten percent of such reasonable expenses or one thousand dollars whichever is greater together with reasonable attorneys fees for the collection of such expenses.
[5] Acts 2006, No. 813, § 1, in the first sentence, twice substituted "fifty percent" for "twenty-five percent" and added "as well as reasonable attorney fees and costs". Historical and Statutory Notes, La.R.S. 22:658.
[6] Plaintiffs argue in brief that they should be awarded additional costs and attorney's fees in connection with their defense of this appeal. However, plaintiffs have not filed an answer to the appeal. Therefore, we are compelled to deny the claim for enhanced costs and fees.