JAMES F. MCKAY III, CHIEF JUDGE
This suit was brought by the plaintiff, Bruce L. Feingerts ("Feingerts"), against the defendant insurer, Louisiana Citizens Property Insurance Company ("Citizens"), for Hurricane Katrina-related property damages. Feingerts appeals the trial court's December 16, 2016 judgment, which awarded him $ 45,000.00 in property damages, but failed to find that Citizens acted arbitrarily and capriciously in handling his claim. For the reasons set forth below, we amend to increase the property damage award to $ 100,000.00, and find that the trial court erred in failing to find Citizens arbitrary and capricious. Accordingly, we affirm in part as amended, reverse in part, and remand for further proceedings.
*65 STATEMENT OF THE FACTS AND PROCEDURAL HISTORY
In 2003, Feingerts' home was damaged during a windstorm. The contents of the home suffered significant mold damage and was transferred to two facilities, Environmental Remediation Services ("ERS") and CRDN/Young's Dry Cleaning ("CRDN"), for cleaning/repair and storage. Travelers Insurance Company, Feingerts' homeowner's insurer, paid for the mold remediation of the home along with the cleaning, repair/replacement and storage of the contents.
After the 2003 storm, Feingerts temporarily leased an apartment in the American Can Company while his home underwent extensive mold remediation and renovation. While living at the American Can Company, Feingerts purchased a renter's policy with Citizens providing coverage for property damage caused by wind and hail, including wind-driven rain. The policy did not cover property damages caused by flood. Specifically, the policy provided $ 100,000.00 in coverage for personal property damage and $ 20,000.00 in coverage for loss of use/additional living expenses ("ALE"). It is undisputed that the policy included coverage for Feingerts' personal property stored offsite, i.e. , the property located at the ERS and CRDN storage facilities.
When Hurricane Katrina made landfall on August 29, 2005, the contents of Feingerts' home were still being stored at ERS and CRDN. The items that were cleaned/repaired were ready to be returned to his home. Both storage facilities flooded during the hurricane. The American Can Company, where Feingerts was still residing, sustained flood and wind-driven rain damage. As a result, Feingerts relocated to a hotel in Baton Rouge.
On August 31, 2005, Feingerts, through his insurance agent, notified Citizens regarding the damage to his personal property located in the storage facilities, and the need for ALE. Feingerts asserted that ERS and CRDN suffered roof damage in the hurricane and that his stored property was damaged by wind-driven rain prior to the flooding. Citizens proceeded to investigate the claim, utilizing a number of different adjusters over the course of several years.
Feingerts began receiving ALE payments, but received nothing on the property damage claim for the items stored at ERS and CRDN. As a result, Feingerts filed a petition for damages against Citizens on August 28, 2007, asserting that his personal property sustained damage from hurricane related wind, which is a peril covered under the renters' policy. Feingerts also asserted that Citizens did not fully compensate him for the ALE provided by the policy. Finally, the petition sought damages, penalties and attorney's fees against Citizens for its arbitrary and capricious handling of the claims.
The matter proceeded to a bench trial on August 24-26, August 31, and September 2, 2015. Judgment was rendered on December 16, 2016, awarding Feingerts $ 45,000.00 on his property damage claim. Sanctions were not assessed against Citizens on the arbitrary and capricious claim. The motion for new trial filed by Feingerts was denied on April 18, 2017.
In this appeal, Feingerts asserts that the trial court erred in: (1) failing to award sanctions against Citizens for failure to timely pay the ALE claim; (2) failing to find that Citizens waived its flood exclusion coverage defense; (3) failing to award sanctions against Citizens for failure to timely pay the property damage claim; (4) giving Citizens a full credit or offset for Feingerts' settlement with the excess insurer *66 at the CRDN facility; and (5) awarding only $ 45,000.00 for property damage.
LAW AND ANALYSIS
Assignments of Error No. 1 and No. 3: Denial of Feingerts' arbitrary and capricious claim asserted against Citizens for its failure to timely pay the ALE and property damage claims.
Because assignments of error No. 1 and No. 3 relate to Feingerts' arbitrary and capricious claims, we will address them together.
The petition for damages alleges that Citizens acted arbitrarily and capriciously pursuant to La. R.S. 22:658 and La. R.S. 22:1220 in handling Feingerts' claims for ALE and property damage. Although the record reflects that the arbitrary and capricious claims were fully litigated, the trial court's judgment is silent on this issue. It is well established that when a judgment is silent as to a litigated claim, it is presumed that the claim is denied. Mason v. Bankers Ins. Group , 2013-0704, p. 12 (La. App. 5 Cir. 1/31/14), 134 So.3d 29, 36 (citing Cambre v. St. John the Baptist Parish , 2012-0590 (La. App. 5 Cir. 5/16/13), 119 So.3d 73, 81 ).
Both La. R.S. 22:1892 (formerly La. R.S. 22:658 ) and La. R.S. 22:1973 (formerly La. R.S. 22:1220 ) set forth affirmative duties for insurers and prescribe penalties for their breach.[1] La. R.S. 22:1892 requires insurers to pay "the amount of any claim due any insured" and imposes penalties if the insurer arbitrarily, capriciously, or without probable cause fails to make such payment "within thirty days ... after receipt of satisfactory proofs of loss of that claim." See La. R.S. 22:1892(A)(1) and (B)(1). Similarly, La. R.S. 22:1973 imposes an obligation of good faith and fair dealing on an insurer, including the affirmative duty to "adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both." See La. R.S. 22:1973(A). Penalties may be imposed if an insurer arbitrarily, capriciously, or without probable cause fails to pay "the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss." See La. R.S. 22:1973(B)(5) and (C).
Regarding our standard of review on this issue, "[a]ppellate courts review the imposition of sanctions using the manifest error/clearly wrong standard." In ReSuccession of Horrell , 2007-1533, p. 11 (La. App. 4 Cir. 10/1/08), 993 So.2d 354, 364 (citing Mathis v. Mathis , 2006-1589, p. 3 (La. App. 4 Cir. 7/25/07), 964 So.2d 426, 428 ). "The bad faith statutes are penal in nature and should be strictly construed." Jones v. Gov.'t Employees Insurance Co. , 2006-1168, p. 7 (La. App. 4 Cir. 6/14/17), 220 So.3d 915, 922-21 (citing Guillory v. Lee, 2009-0075, p. 37 (La. 6/26/09), 16 So.3d 1104, 1130 ). "In order to recover these penalties, a claimant must show: (1) the insurer received satisfactory proof of loss; (2) the insurer failed to pay the claim within the applicable statutory period; and (3) the insurer's failure to pay was arbitrary, capricious or without probable cause." Citadel Broadcasting Corp. v. Axis U.S. Ins. Co. , 2014-0326, pp. 6-7 (La. App. 4 Cir. 2/11/15), 162 So.3d 470, 476 (citing *67 Louisiana Bag Co., Inc. v. Audubon Indem. Co. , 2008-0453, pp. 11-12 (La. 12/2/08), 999 So.2d 1104, 1112-13 ).
As this Court further explained:
Satisfactory proof of loss, as required for an insured to obtain penalties from an insurer, is that which is sufficient to fully apprise the insurer of the claim and the extent of the damage. Yount v. Lafayette Ins. Co. , 08-0380, p. 17 (La. App. 4 Cir. 1/28/09), 4 So.3d 162, 172 (citing Talton v. USAA Cas. Ins. Co. , 06-1513, p. 15 (La. App. 4 Cir. 3/19/08), 981 So.2d 696, 707 ). The insurer becomes subject to penalties when the failure to pay within the thirty day time frame is found to be arbitrary, capricious or without probable cause. La. R.S. 22:1892(B)(1) ; see also Aghighi v. Louisiana Citizens Prop. Ins. Corp. , 2012-1096, p. 4 (La. App. 4 Cir. 6/19/13), 119 So.3d 930, 933. "Arbitrary, capricious, or without probable cause, as used in statutes allowing for penalties and attorney fees when an insurer fails to timely pay a claim is synonymous with vexatious, and a vexatious refusal to pay means unjustified, without reasonable or probable cause or excuse." Sher v. Lafayette Ins. Co. , 07-2441, p. 27 (La. 4/8/08), 988 So.2d 186, 206 quoting Reed v. State Farm Ins. Co., 03-0107, p. 13 (La. 10/21/03), 857 So.2d 1012, 1020-21. Louisiana law requires insurers who dispute the extent of the loss to "tender the reasonable amount which is due," that is "a figure over which reasonable minds could not differ." McDill v. Utica Mut. Ins. Co. , 475 So.2d 1085, 1091-92 (La. 1985). An insurer who fails to tender any amount within the statutory period must have relied on a reasonable defense that would preclude recovery in order to avoid a bad faith finding. Id. Arbitrariness is a question of fact to be decided by the jury. See Coig v. Gregoire , 07-1296, p. 4 (La. App. 4 Cir. 4/9/08), 989 So.2d 786, 789. Whether an insurance company's actions were "arbitrary, capricious or without probable cause" is a fact issue, and thus a bad faith verdict will not be reversed on appeal unless the verdict is manifestly erroneous or clearly wrong. Jouve v. State Farm Fire & Cas. Ins. Co. , 10-1522, p. 9 (La. App. 4 Cir. 8/17/11), 74 So.3d 220, 226. "Great deference" must be accorded to the trier of fact with respect to bad faith. Coig , 989 So.2d at 789.
Citadel , 2014-0326, pp. 7-8, 162 So.3d at 476.
Moreover, in Louisiana Bag Co., Inc. , 2008-0453, pp. 14-15, 999 So.2d at 1114-15 (internal citations omitted), the Supreme Court stated:
[w]hen there are substantial, reasonable and legitimate questions as to the extent of an insurer's liability or an insured's loss, failure to pay within the statutory time period is not arbitrary, capricious or without probable cause.
While an insurer need not tender payment for amounts that are reasonably in dispute, this court has explicitly found that "there can be no good reason "-or no probable cause-for withholding an undisputed amount. Where there is a substantial, reasonable and legitimate dispute as to the extent or amount of the loss, the insurer can avoid the imposition of penalties only by unconditionally tendering the undisputed portion of the claim.
Stated otherwise, "[a]n insurer who does not tender unconditionally a reasonable payment, a figure over which reasonable minds could not differ, will be subject to penalties and attorney's fees." Guillory , 2009-0075, p. 32, 16 So.3d at 1127 (citing McDill v. Utica Mut. Ins. Co. , 475 So.2d 1085 (La.1985) ).
Applying these legal precepts in the present case, we find that the evidence *68 clearly demonstrates Citizens' arbitrary and capricious handling of Feingerts' ALE and property damage claims. The following timeline and facts, which support our conclusion, are derived from the record:
• On August 29, 2005, Hurricane Katrina made landfall in southeast Louisiana.
• On August 31, 2005, Feingerts filed a claim with Citizens for ALE and property damages through his insurance agents.
• On September 8, 2005, Citizens issued a check for ALE in the amount of $ 1,000.00. (For unexplained reasons, two additional ALE checks, each in the amount of $ 500.00, were later drafted but never sent to Feingerts).
• On October 6, 2005, Feingerts met with Citizens' adjuster Stuart Nunley at his apartment in the American Can Company. Feingerts notified Nunley that while he was living in Baton Rouge, his apartment had been broken into and vandalized. Feingerts claims that Nunley would not visit the two storage facilities because he incorrectly thought that the property stored offsite was not covered under the Citizens' policy. Nunley never visited the two storage facilities. For a substantial length of time, Nunley's report, dated January 17, 2006, was unaccounted for and not turned over to Citizens until 2008. Feingerts testified that he gave Nunley a computerized printout of the inventory of the contents in the CRDN facility.
• On October 6, 2005, Feingerts (through his insurance agents) rendered a complaint against Nunley.
• On October 24, 2005, Feingerts sent an email to Larry Crowder (with York Claims Service), informing him that Citizens had the address for the American Can Company apartment building wrong, and providing him with the correct address. Feingerts further states that the offsite storage where his furniture was stored is Environmental Remediation Services, Inc. on Earhart Blvd. (ERS is actually on Broad Street, at the corner of Earhart Blvd. Thus, Citizens submits that Feingerts did not provide the correct address for the storage facility.) The email fails to mention the CRDN storage facility. The email further states that his fourth floor apartment at the American Can Company had water as a result of roof damage to the building. Finally, the email states that "after weeks of begging, I have only received $ 1,000.00 for loss of use [ALE] even though we've been living a hotel and eating in restaurants in Baton Rouge for over 7 weeks now."
• On November 16, 2005, Citizens reassigned the property damage claim file to James Kotter.
• On November 17, 2005, Kotter met with Feingerts at his apartment in the American Can Company. He did not take pictures of the apartment building. Feingerts provided Kotter with receipts for his ALE claim.
• On December 12, 2005, Kotter inspected the ERS facility and took photographs of the roof and interior, showing Feingerts' contents. He did not visit the CRDN facility. For unexplained reasons, Kotter's report was not submitted to Citizens until March 15, 2006. Regarding personal property at ERS, Kotter states in his report that "[o]ur inspection revealed wind damage to the roofing materials of the storage warehouse. Hurricane force winds and flying debris caused damage to the build- up roofing allowing wind driven rain to damage the contents. Presently waiting on insured for a detailed list of damaged items. A supplement will be filed for contents."
*69 Regarding ALE, the report recommends a payment of $ 8,255.80. The report states: "The insured was unable to stay in his apartment because the main roof of the complex was damaged. The damaged roof allowed water to enter the structure resulting in mold growth. The tenants were not allowed back in to the facility. Attached are Mr. Feingerts' hotel bills." (Emphasis added).
• On March 31, 2006, Feingerts received a second ALE check in the amount of $ 5,553.00 (less than the amount recommended by Kotter).
• By February 22, 2006, according to the testimony of Citizens' senior claims examiner Allison Blossman, the Citizens' claim file contained receipts for all of Feingerts ALE from September through December of 2005.
• In June 2006, Citizens adjuster Kenneth Starr visited Feingerts at the American Can Company to assess Feingerts' theft claim that occurred months earlier in the fall of 2005. He took pictures in the apartment and made a list of stolen items. After documenting the theft claim, Feingerts urged him to visit the ERS facility in connection with his property damage claim. Starr accompanied Feingerts to ERS. He took photographs of the interior of the building, including Feingerts' stored property.
• On January 29, 2007, Feingerts issued a letter to Citizens, expressing his frustration and stating that the attached ALE invoices were never paid. In response to the letter, Citizens' file reflects that adjuster Kara Wilkins could not find the documentation to support the ALE claim because photographs to support the fact that the American Can Company apartment was uninhabitable were not in the file. The claim file notes that Wilkins confirmed the fact that the apartment sustained wind damage (a covered loss) and was rendered uninhabitable with the building manager. She indicated, however, that she needed a written confirmation of that fact.
• In February 2007, Feingerts' claim was re-assigned to adjuster, Heather Bass. She authorized no payments on the ALE claim.
• In March 2007, adjuster Chuck Sadtler reviewed the file and agreed to pay the additional ALE. On March 14, 2007, two checks were overnighted to Feingerts, which satisfied the $ 20,000.00 policy limit on his ALE claim.
• On August 28, 2007, Feingerts filed the instant suit.
• On March 11, 2008 claims adjuster Peter Spangenberg inspected ERS on behalf of Citizens. At that time, he took pictures and met with Jay Zimmer, the owner of the facility. Spangenberg did not inspect the CRDN facility.
• On August 17, 2010, Citizens answered the petition, asserting that the policy excluded coverage for flood damages.
• In August 2010, Citizens issued Interrogatories and a Request for Production of Documents to Feingerts concerning the contents at ERS and CRDN. It is undisputed that Feingerts did not fully respond to the discovery. For example, in answer to Interrogatory No. 2, asking for specific *70 information on the purchase of the stored items, Feingerts stated that a significant portion of the documents that would be responsive to the requests were lost and/or destroyed during Hurricane Katrina.
• On April 26, 2011, Feingerts' attorney sent a letter to Citizens' attorney stating ... "I am enclosing an updated listing of the items and replacement costs that were stored at the CRDN Storage facility at 5357 Franklin Avenue, New Orleans, La., which is an offsite storage [sic] covered by Mr. Feingerts' insurance policy with Louisiana Citizens. You already have the computer printout of these items prepared by CRDN, but these replacement costs will update your files. All of these items were damaged by the Hurricane Katrina wind and rain water intrusion. We will be providing you with an updated replacement cost list of the items lost due to Hurricane Katrina at the ERS facility on S. Broad St." The value of the CRDN list totaled $ 77,435.00. Feingerts testified that shortly after the April 26, 2011 letter, he and his attorney personally met with Citizens' attorney and went over the CRDN list.
• On February 2, 2012, Citizens filed a motion to compel responses to discovery.
• On April 26, 2012, Feingerts forwarded the ERS contents list, which included values of the items, totaling $ 171,010.00.
• On July 25, 2013, and July 17, 2015, Citizens' engineering expert, Nicholas G. Cammarata, inspected the ERS facility to evaluate the roof damage.
• On January 16, 2015, Feingerts' expert in mechanical engineering, Lawrence H.Townsend, inspected the ERS facility to evaluate the roof damage.
• On August 24, 2015, the matter proceeded to trial.
Considering the evidence and the testimony set forth in the record, we summarize our findings of Citizens' handling of the ALE and property damage claims as follows:
Citizens' handling of the ALE Claim
Citizens acknowledges that the payments made on Feingerts' ALE claim were late. However, Citizens argues that the late payments were not in bad faith because there was a "legitimate controversy." We disagree. Blossman testified that she did not know the reason for the delay in making the payment to Feingerts. Blossman did state that after Feingerts complained about Nunley, Citizens could not immediately assign a new adjuster because they did not have Nunley's report. Nunley's report was not entered into Citizens' claims file until 2008.
Blossman explained in her trial testimony that ALE is paid on an incurred basis; that is not in dispute. Blossman testified that Citizens had all of Feingerts' receipts for his living expenses by February 2006, yet there was no further activity on the ALE claim until January 29, 2007. Citizens asserts on appeal that Kotter was waiting on more ALE receipts. The record does not support that assertion. Kotter states in his report that he turned in the ALE claim but was waiting on an inventory list of the offsite premises. On January 29, 2007, Feingerts issued a letter to Citizens expressing his frustration that the attached and previously submitted receipts remained unpaid. Adjuster Wilkins indicated that she would not pay the claim because she believed evidence of the American Can Company being uninhabitable as a result of a covered peril was absent from the file.
*71 To the contrary, the record reflects that Feingerts informed adjuster Crowder by email on October 19, 2005, that his apartment was uninhabitable and that he was living in a hotel for seven weeks without ALE reimbursement. The record also reflects no follow up to that email. More importantly, the evidence regarding roof damage to the American Can Company had been in Citizens' file since Kotter's report was submitted on March 15, 2006. That report stated specifically that "[t]he insured was unable to stay in his apartment because the main roof of the complex was damaged. The damaged roof allowed water to enter the structure resulting in mold growth. The tenants were not allowed back in to the facility." (Emphasis added). The fact that the American Can Company (and Feingerts' apartment) sustained wind driven rain/roof damage was never really in dispute. Rather, the record demonstrates that there was simply a long delayed bad faith effort on the part of Citizens to confirm and properly document that fact.
Louis G. Fey, Jr., qualified as an expert in insurance industry standards, claims management, and claims adjustment, testified on behalf of Feingerts. According to his affidavit, Fey has over thirty-three years of practical experience handling complex property casualty claims. From his review of the file, Fey concluded that the delays in paying the ALE claims were unreasonable.
For the foregoing reasons, we find that Feingerts timely presented the proper documentation for his ALE claim. However, Citizens demonstrated no justifiable reason for the delay in paying the claim. Accordingly, the trial court erred in failing to find that Citizens acted arbitrarily and capriciously in handling Feingerts' ALE claim.
Citizens' handling of the Property Damage Claim
It is well documented that Citizens made no inspection of ERS until December 12, 2005, when Kotter visited the facility. Kotter testified that he did not inspect the CRDN facility at this time because he was told the facility had already been cleared out. Dale Velez, owner of CRDN, testified that he started clearing out the building in late October 2005, finishing sometime in December 2005. There is no indication in the record that Citizens ever inspected CRDN (even after the contents were cleared) to determine whether the building sustained roof damage that would have allowed for wind-driven rains to enter the building.
As previously explained, Kotter stated in his report that his November 2005 investigation of ERS "revealed wind damage to the roofing materials of the storage warehouse. Hurricane force winds and flying debris caused damage to the build-up roofing allowing wind driven rain to damage the contents." (Emphasis added). Kotter testified at trial that he spent approximately thirty minutes on the roof. He also stated that he saw water damage on some of Feingerts' property. Kotter conceded that there were items high on the shelves that may not have been damaged. Feingerts testified that he did not give Kotter an ERS inventory list at the time, but that they went through all the items located in the facility. Kotter testified that he told Feingerts that "it appeared that he had gone over the $ 100,000.00 [policy] limit." Kotter's report on the ERS facility was not submitted to Citizens until March 15, 2006. At that time, the report did not contain his photographs or other documentation.
ERS owner, Zimmer, corroborated Kotter's testimony that ERS sustained roof damage. He testified at trial that the repair *72 estimate for the roof damage was $ 51,600.00. Minor repairs were made shortly after the hurricane and the roof was later replaced. Zimmer testified that the photographs of the building offered into evidence show water stains on the ceiling and walls.
In June 2006, adjuster Starr visited ERS after meeting with Feingerts on his theft claim at the American Can Company. (It is unclear from the record why there was no activity on the theft claim from the time it was reported to Nunley in October 2005, until Starr's visit in June 2006). Starr testified that he noticed no water stains on the ceiling at ERS. He did not go onto the roof. Starr denied Feingerts' assertion that he was provided with an inventory list of the contents at that time. It was Feingerts' testimony that he gave Starr the list (a box-by- box inventory) that Zimmer had prepared when the contents were cleaned and stored. Information obtained by Starr on the property damage claim - including the addresses of ERS and CRDN - mistakenly ended up, for some period of time, in Citizens' theft claim file. This apparently led to some confusion on Citizens' part.
Adjuster Spangenberg testified that he saw no damage to Feingerts' contents when he visited ERS in March 2008. However, Spangenberg did not unwrap, touch, or inspect the contents. He stated that he was not there to evaluate the damage to the contents. Spangenberg stated that on this visit he was told by Zimmer that there was no roof damage directly above the room where Feingerts' contents were stored. He acknowledged that those statements conflicted with statements made in Zimmer's affidavit. Based on Zimmer's statements and his visual inspection, Spangenberg determined that there was no roof damage above the room where Feingerts' goods were stored.
In the statement made to Spangenberg in March 2008, Zimmer stated that he did not see water leaks coming through the ceiling above the room where Feingerts' contents were stored. However, Zimmer explained in his trial testimony that the reason he "did not see" water leaking onto Feingerts' property was because he did not return to the building for a couple weeks after the Hurricane. On October 9, 2013, Zimmer executed an affidavit clarifying that the building sustained significant roof damage from Hurricane Katrina, and significant roof leaks entered the warehouse and stained the ceilings and walls over the room where Feingerts' furniture and contents were stored.
Feingerts' mechanical engineering expert, Townsend, executed an affidavit on July 22, 2015, stating that after reviewing all pertinent documentation on February 1, 2012, he concluded that the ERS roof "suffered extensive damage to the drip edge running along a building joint and to an area of built-up roof. The roof damage allowed wind driven rain to damage Mr. Feingerts' belongings that were stored in the warehouse. The damage to the contents was confirmed by photographs depicting water damage to the ceiling of the warehouse." Townsend's opinion remained the same after inspecting the facility on January 16, 2015.
Townsend testified that based on his review of the findings of the U.S. Corp of Engineers, the wind driven rain entering the ERS facility from the roof damage would have occurred hours prior to the flood waters in that location of the City. On his inspection in January 2015, he noted the edge guard (or gravel guard) that had been replaced on the roof. He also noted that water marks were still present on the ceiling, running down the north wall, and on some of the furniture stored above the flood water line. (Feingerts'
*73 property was still in storage at that time.) He demonstrated on one of the photographs where the water marks on the ceiling, "comes out into the center of the room over the racks of contents." Townsend opined that with the damaged edge guard and the lifting of the roof, the wind driven rain would have been able to reach the area where Feingerts' property was stored.
Cammarata, Citizens' engineering expert, inspected ERS on July 25, 2013, and July 17, 2014. He reviewed the photographs taken by Kotter and Spangenberg, Zimmer's statement, and historical aerial photographs of the roof prior to Hurricane Katrina showing patches/repairs work. Cammarata concluded in his 2014 report that the roof damage from Hurricane Katrina was not in proximity to the storage room where Feingerts' property was stored. Thus, "any rainwater that leaked into the building at these wind-damaged components did not cause damage to the stored goods." At trial, Cammarata disputed Townsend's findings regarding the roof uplifting to allow water inside the building. Cammarata also testified that Kotter's photographs, taken in the room where Feingerts' property was stored, depicted peeling paint on the walls and ceilings, not water stains. He did not believe that the marks shown on some of Feingerts' furniture were water marks.
Fey, Feingerts claims expert, stated that the Feingerts claim file was one of the worse claim files he had ever seen. He noted that documents were missing, reports were late and/or missing, and the entire file was missing at certain points in time. These assertions were corroborated by Blossman, Citizens' senior claims examiner. Fey also concluded that misrepresentations were made to Feingerts by adjusters regarding insurance coverage.
Fey pointed out that Citizens received the inventory lists, with valuations, for CRDN in April 2011, and for ERS in April 2012. However, Citizens paid nothing on the claim and never responded with any kind of defense to the inventory lists.
Fey further testified that an insurance company has a duty to investigate the contents, as well as, the structure on this type of property damage claim. Here, he noted that Citizens never did an independent evaluation of the property located at ERS. Moreover, because of their delay, they completely missed their opportunity to view the contents at CRDN.
In his affidavit, Fey opined that Citizens violated industry standards in the handling of Feingerts' claim. He stated that if Citizens disagreed with Kotter's initial findings regarding causation, it was required to voice its concern promptly and conduct a thorough investigation at the time the report was submitted. Citizens did not retain an engineering expert to determine causation for almost nine years, when Cammarata inspected ERS in July 2013.
The facts derived from this record clearly support Fey's assertions and opinions provided in connection with Citizens' handling of this claim. Based on our review of the record, we are compelled to conclude that Feingerts presented a satisfactory proof of loss and that Citizens acted arbitrarily and capriciously in handling his property damage claim.
For the reasons set forth in this discussion, we find that the trial court erred in failing to find Citizens arbitrary and capricious in handling both the ALE and property damage claims. Accordingly, we remand for a determination of sanctions.
Assignment of Error No. 5 : Awarding only $ 45,000.00 on the property damage claim. (Assignments of error No. 2 and No. 4 will be addressed out of sequence below).
In reasons for judgment, the trial court determined that items of property *74 contained in the ERS facility were damaged from wind-driven rain, and thus covered by the policy. Clearly, the evidence supports this conclusion. However, the trial court further determined that Feingerts was only entitled to $ 45,000.00, essentially the "salvage value" of the property that was previously damaged in the 2003 storm at Feingerts' home. There is no support for this factual finding in the record. For the reasons that follow, we find that the trial court erred in not awarding the $ 100,000.00 policy limits.
This assignment of error calls into question the trial court's findings of fact. "Findings of fact are reviewed by this Court under a manifest error/clearly wrong standard." Aghighi v. Louisiana Citizens Prop. Ins. Corp. , 2012-1096, p. 2 (La. App. 4 Cir. 6/19/13), 119 So.3d 930, 932 (citing Detraz v. Lee , 2005-1263, p. 6 (La. 1/17/07), 950 So.2d 557, 561 ). "Under the manifest error/clearly wrong standard, a factual finding cannot be set aside unless, after reviewing the record, this Court finds that there is no reasonable factual basis for the finding." Id. (citing Smith v. Louisiana Dept. of Corrections , 93-1305 (La. 2/28/94), 633 So.2d 129, 132 ).
Feingerts testified that the 2003 storm that damaged his home caused extensive mold damage to the inside of the home and its contents. It was not a flood event. He made a damage claim through his homeowners' insurer (Travelers) and contracted with Zimmer and ERS for the remediation.
Feingerts introduced a letter from Zimmer dated July 22, 2005, stating that the remediation work should be completed by Friday, July 29, 2005 (just one month before Hurricane Katrina). Zimmer testified that the property was still in storage at this time because they were waiting for the house to be remediated and remodeled.
Citizens argues that much of the property stored at ERS had little or no value, yet they made no independent investigation to determine values. In support of their argument, Citizens relies on an inventory list prepared by ERS entitled "Items Not Feasible to Clean." Regarding that list, Zimmer explained in his trial testimony that the items were initially assessed not feasible to clean based on a monetary assessment. "Not that it cannot be properly remediated. It's just costs." He stated for example that books are expensive to clean. While the list included many books, he stated that they might have cleaned some books. He acknowledged that things not remediated were boxed up and placed in the warehouse. However, he stated that "[i]f its [sic] something of value then we probably cleaned it." Citizens made no attempt to examine the contents in order to determine which items were cleaned and which items were not cleaned.
Feingerts introduced evidence that after the list of items designated "not feasible to clean" was prepared by ERS, Travelers agreed to pay for the additional time needed to clean more items, rather than pay to replace them. Zimmer's testimony corroborated this assertion.
On the issue of valuation, Blossman acknowledged in her trial testimony that Feingerts' inventory lists from CRDN and ERS totaled $ 248,000.00. ($ 171,010.00 at ERS and $ 77,435.00 at CRDN). When asked if she had any documentation to suggest that the value of the contents for both units was below the $ 100,000.00 policy limits, she answered "no" stating that she had no documentation on the items to support a value at all. She also stated that other than Kotter, no one from Citizens ever physically went to ERS to examine the contents, i.e. , no one followed up after the December 2005 visit.
*75 Stephanie Jackson, Citizens' corporate representative, testified that it is industry standards that property inspections and appraisals should be scheduled immediately as part of the insurer's investigation of a claim. She did not know whether these standards were applied in Feingerts' case.
Our review of the record reveals no evidence that anyone from Citizens opened any boxes or removed the shrink wrap to assess the items for water damage, and/or placed a value on the items. Citizens did not respond to Feingerts after his last supplemental inventory list was provided to Citizens' attorney in April 2012. Moreover, Citizens presented no expert to dispute the values assigned by Feingerts or to assign a depreciated value.
It is undisputed that Citizens presented no evidence to contradict the valuation proposed by Feingerts. "[W]here no contradictory evidence is presented the plaintiff's testimony as to the value and description of the property, including the place of purchase and the price, may satisfy the burden of proof of the plaintiff, provided such testimony contains a minimal degree of detail or specificity as to value to support an award of monetary damages." Cho v. Royal Oldsmobile Co., Inc. , 98-0527, p. 8 (La. App. 5 Cir. 11/25/98), 722 So.2d 1138, 1142 (citing Unique Const. Co., Inc. v. S.S. Mini Storage, Inc., 570 So.2d 161 (La. App. 5 Cir.1990) ). See also Vallee v. Hyatt Corp. , 433 So.2d 1070 (La. App. 4 Cir.1983).
We recognize that a plaintiff has the burden of proving the amount of his property damage claim. Here, in order to recover the policy limits, Feingerts had to prove $ 100,000.00 in damages (including any depreciation). On the uncontroverted evidence presented, we find that Feingerts satisfied his burden in establishing his property damages.
For the reasons stated herein, we find that the trial court erred in its award of $ 45,000.00 on Feingerts' property damage claim. We amend to increase the award to $ 100,000.00, the limits of the Citizens' policy. As amended, we affirm.
Assignment of Error No. 2: Failure to find that Citizens waived its flood exclusion coverage defense.
Feingerts argues that Citizens was required to obtain a non-waiver agreement or send him a reservation of rights letter as soon as it became aware of a possible coverage defense, i.e., the flood exclusion. He submits that the failure to do so waives the defense. Because we have determined that Feingerts is entitled to the $ 100,000.00 policy limits on his property damage claim, we deem this assignment of error to be moot. Thus, we pretermit any discussion on this issue.
Assignment of Error No. 4 : Giving Citizens a full credit for Feingerts' settlement with the excess insurer.
Feingerts recovered a gross settlement of $ 105,316.00 for his property stored at CRDN from CRDN's insurer. Feingerts argues that the trial court erred in granting Citizens a credit for that settlement. As with the previous assignment of error, our award of the policy limits on Feingerts' property damage claim renders this issue moot.
DECREE
For the foregoing reasons, that portion of the trial court's judgment granting Feingerts $ 45,000.00 in property damages is amended to increase the award to $ 100,000.00. As amended, we affirm. The trial court's denial of Feingerts' arbitrary and capricious claim against Citizens is reversed. The matter is remanded for a determination of attorney's fees and penalties *76 to be assessed against Citizens in accordance with this opinion.
AMENDED AND, AS AMENDED, AFFIRMED IN PART; REVERSED IN PART; REMANDED

"Acts 2008, No. 415, § 1 amended and reenacted Title 22 of the Louisiana Revised Statutes of 1950, the Louisiana Insurance Code, and directed the Louisiana State Law Institute to redesignate the provisions of Title 22, formerly comprised of R.S. 22:1 to 22:3311, into a new format and numbering scheme comprised of R.S. 22:1 to 22:2371, without changing the substance of the provisions." See Editors' Notes, La. R.S. 22:1892, La. R.S. 22:1973.